I'm joking. He's a junior. No, we appreciate your help, Judge Oldham. And the case, I don't need to tell you all about the rules. We do appreciate your attempting to adhere to the time limits, which are 16 and 20 minutes, respectively. The case is Ad Hoc Group of the New Secured Noteholders, No. 2320557. We'll hear from Mr. Francisco first. Judge Jones, and may it please the Court. Although the facts of this case are complex, maybe I should step back a little, the legal issues aren't. The lien-related litigation had two basic purposes. The main purpose was dividing up the $85 million enterprise value. That's what we spent the first two years litigating in phases one and two. But a secondary purpose was valuing actual causes of action to add actual money on top of the $85 million, of which the lien litigation complaint was one. No one, however, thought that you could just add $200 million of monopoly money to the estate. But at the end of the day, none of that really matters. At most, the plan lets the creditor representative stand in the shoes of the debtor Sanchez, subject to all of the defenses that the secured creditors could have asserted against Sanchez itself. So if Sanchez couldn't obtain a value judgment under 550A, neither could the creditor representative. And here, Sanchez couldn't itself get a 550A value judgment for three basic reasons. First, the estate already had the liens, and under 550A, you can recover the property or its value, but not both. Second, the estate didn't lose any money as a result of non-possessory liens that were never exercised, and it certainly didn't lose $200 million. So allowing it to get both the liens and the $200 million value judgment gives it a massive windfall. And third, the lien challenge complaint named just one defendant, the collateral trustee. But the only assets that the collateral trustee had were the liens themselves. So while it could return the liens, it had no money to pay a value judgment. And a value judgment against a defendant who can't pay anything doesn't have any value, and it's certainly not worth $200 million. Now, there are lots of other issues, but I think that those three basic issues are more than sufficient to resolve this case. Counsel, does it matter whether the liens were non-possessory? Your Honor, I think it does matter to a lot of different issues that we're raising, particularly whether or not the estate lost $200 million as a result of non-possessory liens that were never exercised. Nobody actually claims that it did. Nobody claims that this estate was worth $200 million the day before the correction affidavits were filed than it was the day after the correction affidavits were filed. The Bankruptcy Court expressly declined to address that issue. Their expert didn't address that issue. And our expert, Professor Fischel, explained in great detail how when it comes to non-possessory liens, the state doesn't actually lose any property because the secured creditors never exercised them to seize the 10th Circuit and the 4th Circuit held in the Trout and Brumis case, which are the only two other appellate decisions that have addressed non-possessory liens that have never been exercised. Both understood that if you awarded a value judgment in addition to return of the liens, you were simply conferring upon the state of windfall. It ends up with the underlying collateral. Here, Sanchez had the underlying collateral all the time, including all of the proceeds it generated. It gets the liens back, and in addition, it gets $200 million that nobody thinks it ever otherwise would have had. Trout and Brumis are directly on point. But this isn't getting it. The creditors are getting 70% of the stock, right? Yes, Your Honor, but It's not coming in money at all. It's the allocation of the stock. That's true, Your Honor, but the whole point of the plan is that it says, and this is quite expressed in the plan, it says that what the creditor representative has the right to do is stand in Sanchez's shoes. That's section 4N of the plan, which says the creditor representative shall have standing to prosecute the lien challenge complaint as of the date hereof. And then if you look at the definition of the lien-related litigation, it explicitly preserves all of our defenses, and I'd like to read this because it is so critical. Nothing in the plan, this is coming straight from the plan itself, nothing in the plan or the confirmation order shall alter, amend, or otherwise limit any rights, claims, or defenses that may be asserted by the dip lenders, the collateral trustee, or any of the holders of the dip claims or senior notes claims in connection with or in defense of the lien-related litigation. So when you put that together, all the creditor representative has is the standing to stand in the debtor's shoes. If the debtor was incapable of recovering a value judgment, if Sanchez was incapable of recovering a value judgment, so is the creditor representative, because all it's doing is prosecuting the case on behalf of the debtor itself. And for the reasons we just explained, there is no world in which it could get a $200 million value judgment when the debtor could never show that it lost $200 million. The only loss to the estate that anybody has even attempted to point to were so-called bad terms as part of the dip loan. Well, first of all, Your Honor, there is no world in which they lost $200 million worth of bad terms as against a $100 million loan. That is simply impossible. Rather, the only thing that they point to are the so-called fees that were paid on the dip. Well, those fees were a total of $14 million, a million dollars of which went to my friends sitting over here. So that's the absolute cap of what the estate could possibly have lost. How are non-possessory liens valued generally? Well, Your Honor, I'm— Is there some type of methodology or expert testimony or some type of market— Sure. —validation that suggests that they have a value that is ascertainable? So if you think about what a secured instrument is, it's basically two things. It's a stream of payments, and then it's the right to foreclose in the event of the default. And that's the lien part, the right to foreclose. I'm not sure how the debtor itself could isolate and sell simply the right to foreclose. But let's assume for the sake of argument that there were some conceivable way that they could do that. What would the person be buying when they purchased that at the time of the transfer? What they would have been buying is the right to fight with us over whether our presumptively valid liens were in fact valid liens. Because on the transfer date, we did have presumptively valid liens. But as the dip process shows, there was nobody here that was willing to take on that fight. Nobody. And certainly nobody would take on that fight for $200 million because why would you pay $200 million for the mere chance at winning $200 million after a two-year fight? That simply makes no sense, which again is why the debtor itself in no world could have ever established its entitlement to a $200 million value judgment, which means that neither can the creditor representative here. I would like to address my first point, though, about the plain text of 550A itself. Because 550A itself says that you can recover, the trustee can recover either the property or its value if the court so determines. It's one or the other, not both. If I say pick door number one or door number two, you can't pick both. And respectfully, that's pretty much what the court said in the DeBerry case itself. When it said, and I'm quoting, we hold— The author of which is sitting to my right. I understand. Yes, Your Honor, the author who knows the case far better than I do. But in addition to DeBerry, I would also actually point you to this court's decision in Enri Williams. Enri Williams involved 1325A, the so-called wage earners plan. And 1325A is structured in precisely the same way as 550A is. What 1325A says is that the debtor in a wage earners plan can get one of two things. It can either keep the collateral and pay its secured creditor the cram-down value of the collateral, or it can surrender the collateral. In that case, the debtor argued that it should be able to do a little bit of both. It should be able to keep some of the collateral and pay the secured creditor value and surrender other parts of the collateral. This court held no, because just as 550A, 1325A creates an either-or choice. There's not a third choice where you get to combine both together. And in holding that, this court rejected the exact same argument that my friends on the other side are making, that in that context, or doesn't mean or. So frankly, Judge Engelhardt, I don't think you ever need to get to the value issue because I think it fails out of the gate under the plain text of 550A. But even if you think that in theory they're entitled to get value even though they've already gotten the property back, there's no way they can get $200 million of value when the estate didn't lose $200 million. Which leads me to my third point. They only named one defendant in this case, the collateral trustee. Why are you here then? The reason we're here, Your Honor— If it's a defendant that has no assets, why are you bothering to make arguments? Well, because, Your Honor, we lost in the court below for erroneous reasons. At the time that the lien challenge complaint was filed, it actually was very valuable. At the time the lien challenge complaint was filed, I think this estate was worth around $400 or $500 million. That meant that after the dip loan was paid, there were still $700 million left to divide between the secured creditors and the unsecured creditors. And if you simply had the liens returned to the estate, which is what a suit against the collateral trustee could do, return the liens to the estate, that would have meant that the unsecured creditors were entitled to quite a bit amount of money. But the problem is that after the lien challenge complaint was filed, the value of the collateral collapsed. Yet, it nonetheless contains only one defendant and one defendant alone, the collateral trust. And while the collateral trust was the perfect defendant when the lawsuit was about getting the liens back, because that's what it had, it was a completely incapable defendant if your goal was to recover $200 million because it didn't have any money at all to pay a value judgment. And I think that is also relevant to understanding what the purpose of the whole plan was and what the importance of the lien challenge complaint was to this litigation. If the lien challenge complaint were truly this $200 million pot of gold, don't you think that at some point before the challenge period expired, the creditors' representative would have tried to add a defendant that had the ability to pay a $200 million judgment or even a one-penny judgment? The fact that it didn't means one of either two things. One, it means they missed the issue. Or two, it means that nobody actually thought the lien challenge complaint was worth anything more than simply getting the liens back. Mr. Francisco, couldn't it mean a third thing, which is that no one was actually worried about getting $200 million and a judgment? In fact, all they were trying to do were to value these claims for purposes of the equity distribution. So I take it that your friends on the other side, their principal argument is going to be this isn't about entering a 558 judgment. This is about just looking at the stuff, I guess, that's in Schedule D, determining the relative values of those, and then doing a fraction. And, Your Honor, that is their principal argument. But I still go back to the plain text of the plan, which says that all they have is standing to stand in the debtor's shoes and to prosecute it as if the debtor were itself prosecuting it, subject to our defenses. So even if you think theoretically they were never actually going to recover the actual money, the theoretical exercise is still one in which asks could they have recovered the actual money had the complaint actually been pursued by the debtor itself. And it couldn't, one, because they already have the property back, two, because there's no world in which you can recover $200 million when you didn't lose $200 million, and three, there's no world in which you can recover $200 million when the only defendant that you sue is structured in a way such that it can never pay. It's not the case that the collateral trustee was impecunious. It's the case that the collateral trustee was specifically designed for one purpose and one purpose alone, to return the liens. That's why it didn't have any money to pay a value judgment and why Sanchez itself couldn't have recovered a value judgment. We understand that. Was the disclosure statement filed in connection with the plan? Excuse my voice. Yes, Your Honor. There was a disclosure statement. I was sort of surprised that nobody attached it because normally the disclosure statement would have some obligation to describe the terms of the plan and the import of the litigation that was contemplated. Your Honor, I believe the disclosure statement is part of the record, and I think there's some... I understand that. It ain't in the record excerpts. Oh, I apologize for that, Your Honor. But the disclosure plan is actually quite relevant here because in the disclosure plan, the debtor, Sanchez itself, estimated what it believed all of the various reserved causes of action were worth. And the lien litigation complaint was just one of numerous causes of action that were reserved. What were the other ones? They were things like the excessive compensation suit against the Sanchez family, which returned around $2 million. Your Honor, I can't remember what they all were, but there was a long list of them. Lien challenge complaint was just one. The debtor estimated that all of the causes of action were worth less than $5 million, and then it targeted its best estimate at around $2.5 million. So again, if the lien challenge complaint were truly this pot of gold, it was a pot of gold that was buried deep in the sand that nobody ever saw until after we had gone through two years of litigation over whether we were entitled to the entire $85 million in the estate value or they were entitled to the entire $85 million of the estate value. Counsel, let me ask you about your 28J. If we were to agree with regard to the Occidental Termian case, which makes clear that, according to your argument, you had real property liens on the wells, how would that impact the valuation? Sure. Are you arguing that solely because it would support vacating or is there something else in the evaluation that we need to know? It would drop the valuation substantially. We haven't formally run the numbers, but by our sort of back-of-the-envelope estimate, it would go from a $200 million valuation to probably less than a quarter of that and substantially less than a quarter of that. And I'm happy to address the wells issue in more detail because I think it is one of the most straightforward state law errors that the Court made below. And there are lots of things in the record, but one of them is one of the deeds of trust, which is pretty illustrative of all of the deeds of trust. And this begins on page 18023 of the Record on Appeal. If you look at the third page of that, at the bottom, what you'll find is the first substantive paragraph, paragraph A. And what paragraph A does is it essentially grants liens on two groups of things. First, it grants liens on, quote, gas and mineral leases. And then it goes on to grant liens on, and I'm quoting, all other rights, titles, interests, or estates described on Exhibit A, attached here to, and made a part here of. So it explicitly incorporates Exhibit A. If you look to Exhibit A, what you're going to find are two schedules of leases, two schedules of liens. One of them has all the leases, and that's where all of the errors were that the Bankruptcy Court relied on. The other is a schedule of wells, and nobody's identified any errors in the wells. So even accepting the Bankruptcy Court's finding that there were errors in the leases, and with respect, we disagree with them on that, the wells should have had perfected liens on them. And even if you accept all of the other Bankruptcy Court's analyses of how you value things, if you valued the wells as having perfected liens, that would have substantially reduced the overall value of this, even, again, using the Bankruptcy Court's own analysis. Bottom line here is they can't get anything more than the debtor itself could have gotten. The debtor itself couldn't have gotten anything, and it certainly could not have gotten $200 million. I'm happy to answer any other questions that your Honours have, but I do note that my time is running out. Yeah, well, when you stand up for rebuttal, I think you're arguing several different possibilities. One of them is that since there was a return of the liens, that that was the sole satisfaction and the unsecureds would get zero in terms of stock. And yet you also seem to be hedging about values of the wells and so on, subject to the collateral. I'm not quite sure what you're lighting on. Would you like me to answer that right now very briefly, Your Honour? Our primary argument is that they're not entitled to anything. They've gotten the liens back, and as Trout and Brumus made clear, even if you think you can get both the liens and value, when it comes to non-possessory liens, all you get are the liens, because the estate doesn't actually lose anything from a non-possessory lien that has never been exercised. So for those two reasons, our main argument is that they're entitled to nothing. But our alternative argument is that there's no world in which they're entitled to as much as $200 million, because they haven't even attempted to show that the estate lost $200 million. The only argument as to what the estate lost was that $14 million in fees that were paid on the dip. Now, I think that's wrong, but that would still give them a substantial recovery. They would end up with 14% of a billion-dollar company as against their zero-dollar investment if you simply recognize that the loss here was at most $14 million in fees. All right, thank you.  Thank you, Your Honor. May it please the Court. The parties and the bankruptcy court below had to solve a distinct set of problems when they entered the Chapter 11 plan below, which, by the way, has not been challenged. Here was the basic problem. Appellants had pre-petition liens on all of the assets of the company, but with respect to 74% of the value of the company, there was a real question about whether those liens were preferential and therefore avoidable in bankruptcy. Normally, that might be worked out ahead of time. Before the Chapter 11 plan, you'd decide what are preferences, what are avoidable. Then you would either distribute cash or equity, but there wasn't time to do that. So they reached two critical compromises that both sides agreed with and that Judge Isker embodied in his orders. The first was with respect to the dip lending. Appellants had brandished those liens, which turned out to be preferential and therefore avoidable, to scare off all other dip lenders and get... Wait a minute. Well, I mean, this is my first question about this from a practical standpoint. In bankruptcy, you quite often have senior secured lenders who end up being the dip lenders and get a super priority lien as a result. That's correct, Judge Jones. The twist here and the thing that led to all the issues that are now before the court is that they were essentially posturing as senior secured lenders, but with respect to 74% of the assets, there was a question whether those were preferential and avoidable liens, and it turned out they were. But the way the plan worked is that the parties agreed, and Judge Isker confirmed, that the valuation of those causes of action, the valuation of avoiding their pre-petition liens, could be worked out as part of the distribution of the equity after the fact. Except for the fact, yes, and I think you're sort of mischaracterizing this, or maybe more precisely, I think Judge Isker sort of mischaracterized, which is why I was asking about the disclosure statement, because throughout the plan and the disclosure statement, this is referred to the lien-related litigation. Litigation. Valuation, it said it can be adjudicated or resolved by other means, any means including valuation, but it's still litigation. So what gave Judge Isker the right to make up a hypothetical theory about the value? So, Judge Jones, it's Section 4D of the plan combined with the plan's definition of lien-related litigation. So let me take that in two parts. The plan's definition of lien-related litigation sets out a number of categories, and one of those, as would make sense, is the causes of action in the lien-related complaint. So that's those causes of action that are either declaratory judgments that liens are preferences or for 550 value. Then the lien-related litigation three-step process in Section 4D culminates in Phase 3, which says Judge Isker should value those causes of action. That was only after you got through Phases 1 and 2, and what I'm focusing on initially is the terms of the plan, which, frankly, they don't really argue very well, but it is litigation. It is not some kind of mediation according to what the bankruptcy judge thought was the appropriate way to adjudicate litigation. Judge Jones, let me point you to two other provisions of the plan. One is in the paragraph of 4D after that three-step process, and in that paragraph, it says, Judge Jones of the Bankruptcy Court, in his discretion, shall award equity in the new debtor, Mesquite, based in part on the valuation of those causes of action. So what the parties understood and what Judge Isker understood, who's entitled to deference in the interpretation of a plan embodied in a confirmation order, is that the parties would value... There would be a trial, which happened, about the valuation of these causes of action. But all of that could be done within the framework of ordinary preference litigation. The first question was, do we look to the dipped liens as being infirmed to the same extent as the original property liens? He found that against them to begin with, then a year or more later, he comes back and he says, no, the dipped liens are super-secured. Can I... I'm sorry, go ahead. Go ahead. Well, let me clarify, because they've raised an argument that, well, you didn't need to value these causes of action because you could have won this other way in Phase 1. That's true, but does not help their argument. So we had two arguments below. The first argument was a way we could have won just in Phases 1 and 2, and essentially the argument was this. The dipped liens did not cover any leases that had been subject to a preferential pre-petition lien. So if it turned out the correction affidavits were avoidable, they wouldn't have even had a dipped lien on the underlying leases, what's called the HHK leases. We won that initially, then Judge Isker reconsidered. We lost that. If we had won that, we don't need to get to Phase 3. We don't need to value these causes of action. We lost that. So then our second argument is that even if the HHK leases themselves don't go into that pool of assets for the unsecured creditors, we still preserved in the final dip order and in the plan itself avoidance actions that the estate has against appellants for their correction affidavits, which were preferential because they were within 90 days, preferential transfers of value to them. And so that was the argument. Now, their main argument on appeal, Judge Jones, is that the plan simultaneously preserved those cause of actions as the mechanism to award equity and destroyed them, rendered them worthless on day one necessarily. Now, it's true. The plan says the causes of action might not have value. It says value, if any. But their argument is that the plan itself necessarily rendered them valueless. That can't possibly be right, and that's why Judge Isker said their argument would neuter. It's not the plan itself. It's not the plan itself. It is the consequence of sections 550 A and D. I mean, it's not, you know, that's why I asked about the disclosure statement. Did the disclosure statement squarely present all these options? It did, Your Honor. So the disclosure statement— So how come you didn't put it in your record excerpts? I think that was an oversight by both parties, Your Honor. There is oversight. Well, I think we can work together and supplement that for the court and file something for the court. We'll look it up ourselves. But let me just tell you what the disclosure statement said relevant to this. The disclosure statement explicitly said that the lien-related complaint would be used to award equity in the reorganized Sanchez. That's what it said. People were on notice of that. So the disclosure statement said that expressly. But that doesn't mean, that does not mean that the terms of the plan where the senior securities gave up their liens, which was a negotiated term of the plan, they didn't have to do that, but they did, in exchange for equity in what looked like a pretty tiny little company at that time. So I think it proves too much to say that their argument necessarily means the plan was worthless. Well, I'm happy to go on to our alternative statutory argument if you're interested, but let me just close the loop on that, Judge Jones. As Judge Isger said below, their argument is that they gave the liens to themselves. I mean, their claim is that they got 100% of the company simultaneously with releasing the liens to the company. What Judge Isger found is that they parlayed their pre-petition preferential liens, which were avoidable in bankruptcy, to the superseding dip liens, and got all the value, not just fees, not just paying themselves $37 million in interest, but a controlling position in the Chapter 11 plan, a minimum of 20% of this company, which is now alone worth $200 million. So it's not as if they just released these liens at a time when they were the exact same thing before. So just to give an everyday hypothetical on that, suppose that day one you own your home free and clear, and day two someone comes in and says, sorry, you have a lien on your 74% of the value of your home. One, you've clearly experienced a loss of value. Now, you can't put that home equity up as collateral to get another loan. You have to take a loan at higher terms. Just like a company like Sanchez couldn't then use all of these assets as collateral to obtain financing, you've clearly suffered a loss at that point. Now, what appellants want to say is that, well, day three we came back and we said no more lien, and so you're in your pre-transfer position. But that's not what Judge Isger found happened in findings entitled to clear or review. He found that someone came back day three and said, the good news is you no longer have those liens. The bad news is we've parlayed these into superseding liens, and we still have a lien on 74% of your property. That's what Judge Isger found below, and that's why it's just not right to say, well, we only got some fees for these liens. What they got was the DIP lender role that they used to get a minimum 20% of the company, at the end of the day, 30%. What I'm saying to you is it's not unusual in bankruptcy cases for precisely that kind of transaction to occur. It's not unusual, Judge Jones, for a senior lien holder to become the DIP lender. What was unusual about this case is that they weren't actually senior lien holders with respect to 74% of the assets, but there wasn't time to figure that out. So the parties agreed on this plan that said, you know what? You have DIP liens on all of the assets of this... But it's a situation of you as the gold bank's rules, and there were plenty of people. You know, the unsecureds, or whoever the unsecureds are now, could have come in and done the same deal. In fact, you did do the same deal. You rolled the dice on being able to parlay a minuscule investment into 80% of the company, right? Well, the unsecured creditors did offer a DIP financing deal, as did the appellants, the secured creditors. But remember, Judge Isker rejected their initial proposal, and he said the only proposal that's fair to the company because there is this real question about whether you actually are senior secured lenders with respect to 74% of the assets is to carve out the avoidance actions that the estate has against you. And you know what? You'll be DIP lenders, and you'll have a lien with respect to most assets. But if it turns out at the end of the day that your prepetition liens that you brandished to get that role were preferential and avoidable, you're not going to get that value. And then that was rolled into the plan itself, where the parties agreed, and it's a plan that's not challenged at this point, and it's res judicata, that the valuation of those preserved causes of action would govern the equity distribution. And their essential argument is that when my clients and Judge Isker agreed to this plan, they threw away that key concession. They just said, well, we're going to have a release of liens, and therefore the valuation of these causes of action that were the key concession at the... Well, it's good that you weren't negotiating on behalf of the unsecured, if that's the way it turns out. Well, Judge Jones, and maybe I'll go to my alternative statutory argument, because I know Mr. Francisco raised a couple other arguments. 550A says the word or. Or is defined in the bankruptcy... What's the best case to support that, and how do you distinguish the very? Absolutely, Your Honor. The best case to distinguish it, other than just the plain text of the definitional provision of the Bankruptcy Code, is Locke v. Flambeau, where the Supreme Court said the Bankruptcy Code defines or to be inclusive, which is what its plain text says. I'll give you another case, Your Honor, the TransCare case out of the Second Circuit from 2023. In that case, the property, which was contracts and stocks and subsidiaries, had been returned to the estate, but it declined in value over time. And what the Second Circuit affirmed was you could get the going concern, i.e. the original value minus the liquidation value of what had been returned. So you could get property and value. The cases they cite, Your Honor, they cite a lot of cases in their reply brief, they're single satisfaction cases. They're cases saying that under D, you can never get more than a single satisfaction. And let me just give you their statutory argument and explain why it's wrong, because you didn't hear a lot about the plain text, as you noted. They say that, well, context can overcome that definitional provision. That may be true in some cases, but here the context cuts all the other way. Regardless of how you interpret the word or, a trustee could never get a windfall, because the single satisfaction rule of subsection D will always cap at a single satisfaction. But under their interpretation where it's either or, the creditors could frequently get a windfall. And de Berry's really key on this. Think of what could happen under their rule. The management of the company could give a preferential or even fraudulent transfer of, let's say, a car or a machine. It's used, it's broken, right before bankruptcy under de Berry. The creditor could give that back at a tenth of the value and say, hey, we're giving you the property back. We're good. There's no more to do under 550. And now the unsecured creditors are out of luck because they've lost 90% of the value. That can't be how it works. The context on that cuts all our way. I'd like to address the three other things Mr. Francisco said about... So why does de Berry not govern this in its interpretation of 550A? So de Berry is clearly correct, and I'm not just saying that because Judge Oldham wrote the opinion. De Berry just says when the transfer was cash and you give the full amount of cash back, it doesn't matter that you gave it back before the bankruptcy petition was filed. The single satisfaction rule doesn't only kick in, you know, once the bankruptcy petition's filed. That's right. The problem here is, as Judge Isger found... Judge Oldham doesn't write with that kind of finesse sometimes. He said that's... And that's not a criticism. What I mean is, he says the statute says this. Recover. He focused on the word recover in his opinion, and I think the natural meaning of recover is if you give somebody a Maserati and they crash it and return scrap to you that you can sell for pennies on the dollar, no one would say, I recovered my Maserati. Well, I will say this is a sufficiently unusual question because we don't have many authorities about it, do we? This court? About being able to recover, not only avoid the preferential lien, but also to get money back from the creditor. Well, Your Honor, what the court does have authority on is... I mean, that... Preferences are supposed to be easily resolved in order to restore the... put this creditor back in the same position as the unsecureds, for instance. Correct, Your Honor. Giving up the liens would have done the same thing. It would not have, Your Honor, because as Judge Isger found in factual findings entitled to clear error review, they parlayed those liens into a controlling position in the bank... But I never heard of subjective interpretation of a lien transaction by the bankruptcy. And I think the other... Everybody negotiates and everybody does deals, but ultimately you look at what the paper is, not about the intent. Judge Jones, I don't think it's subjective, and I think the key rule in this court's precedent that my friends I think don't even respond to in their briefs is a case called Abramson. And Abramson says the value you get is the value at the time of transfer. There it was an option that would have expired by the petition date, and that the debtor could not exercise anyway because it couldn't pay the strike price. It didn't matter. The court said it's value at the time of transfer that matters. It's a windfall to a creditor, and it does not return the debtor to the pre-transfer position if the value of the asset goes down significantly, and all you get back is the scrap metal as your property return, and I don't think de Berry contradicts that. I want to briefly address the lost point that they make. Because they hadn't given up the liens, what would have happened? No Chapter 11 at all. No plan of reorganization. It would not have mattered. The liens were worthless at that point. They were worthless for a few months. They were worthless because, as judges... And it still had liens on oil and gas wells, and, you know, you ask any oil and gas guy, and a well's a well. Judge Jones, I'm happy to address the wells point. I know Judge Englehart also asked about that. They're wrong about that. They didn't really brief this issue. You only see it in the 20... Well, what Judge Isger found was that there's a clause in the deeds specifically addressing wells, and so it was improper grammatically and just as a matter of specific governance to general to read a different clause to be about wells as well. Because the clause about wells said wells in the subject interests. But they were reading a different clause to mean wells were subject interests. It didn't make sense. Judge Englehart, the Occidental case has absolutely nothing to do with that kind of specific governance in general. It was about a totally different issue where some language in the exhibit limited the grant, arguably. The court said it didn't. It had nothing to do with the issues in this case. On the... I hope I get a chance to just talk about the value issue and the proper defendant issue, because Mr. Francisco raised both of those. Their claim is that the statute requires some loss to the estate in order to get a value award. That's not what the statute says. The statute says the word value. It does not say the word loss. And what they mean by loss is either trivially true and doesn't change the analysis here, or it's wrong. So any time that property with a given value is transferred to a creditor, the estate, by definition, loses the value, just in terms of the liens at issue here. When a creditor takes liens on 74% of the assets in your company or your house, now you don't have the value of those assets to put up for collateral to get another loan. You have to go get unsecured debt at a higher interest rate. Any CEO in America would say they lose value if suddenly there's a lien on 74% of the assets of their company. So it's just not true. And under Abramson, the value is judged at the time of transfer. It was an option there that had expired by the time he got to litigation. It's judged at the time of transfer. Even if you look all the way through the bankruptcy, you won't think that's proper, but that's kind of the mode of analysis they've adopted. It's not just $14 million in fees. They parlayed them into the dipped liens, which, under the plan, got them an immediate 20% of the company, which is now worth $200 million alone, could be worth more in the future. If you look at the time of the transfer, the company was worth a half a billion dollars, and they got liens on 74% of the value. It is not remarkable at all that that would be worth $200 million. I think that's a completely natural estimate. And in fact, at the end of the day, what happened? They had valid non-preferential liens on 26% of the company, and although the analysis was much more complicated than this, at the end of the day, they got 30% of the company. They didn't have liens on 74%, and the unsecured creditors, which includes them a little bit, too, got 70% of the company. I mean, if you're looking at it just at a high level, it makes total sense what happened below. I wonder if I could address the proper defendant issue in a few sentences. My time has expired. So this is the last issue Mr. Francisco talked about up at the podium. It all turns on the interpretation of section 23A of the final dip order, which is at page 20392 of the record. That's the part of the order that said, if you want to file any causes of action, do it within 30 days. They say the problem with this cause of action was you didn't name them, you just named their agent, and their agent doesn't have any money, so the value's zero. Judge Isger, who's entitled to deference in the interpretation of his own orders, rejected that for two reasons, and they're both correct. The first reason was that 23A language, and again, it's at 20392 of the record, did not require the parties to name every defendant. It just required that the basis for the claim be said with specificity. They've picked up on language... This is really important, but it's a little wheezy, but they've picked up on language in that sentence that says, against the secured parties, or something relating to them. But if you look at that language, Your Honors, there's two buckets of claims. And the first bucket is any challenge to these liens. The second bucket is or otherwise against them. So that first bucket did not require us to name the defendants, and even if it was close, Judge Isger would be entitled to deference in the interpretation of his own order. The last point I'll make on this is... He's entitled to deference, but he isn't entitled to rewrite it post hoc. Of course, Your Honor. But we think that's, for the reasons I just explained, the best interpretation. The other point is this. If it turned out we're wrong about that, and you had to name the defendants, then the only sensible interpretation of the plan is that it's sufficient that there's a defendant against whom judgment could hypothetically be entered, not who's collectible. And it all comes back to the same problem with their primary argument. The parties knew what the lien challenge complaint said at the time they agreed to the plan and entered the plan. If it were really true that that complaint on its face was just worth $0 because the appellant's agent was judgment-proof, then the plan makes no sense. They established this three-phase process to allocate equity based on the valuation of these clauses of action, and they would be worth $0. So that can't make sense. It's the problem that goes through their briefs. They're trying to rewrite a deal they agreed to on how to allocate this equity. Judge Esger did not commit reversible error or any error at all. We would ask the Court to affirm. All right. Mr. Francisco. Just a few points, Your Honor. I'd like to begin sort of where my friend left off on the creditor representative and the collateral trust and what the plan actually says. Paragraph 4N of the plan says the creditor representative has standing to prosecute the lien challenge complaint as of the date hereof. That's a quote. As of the date hereof. And on that date, there was one defendant and one defendant alone, the collateral trust. The paragraph 23 of the final dip order, which my friend didn't actually quote, but I will, to the extent that the official committee of unsecured creditors, and I'm ellipsing out a lot of language because it's very long, seeks to assert, to the extent the committee seeks to assert or prosecute any action against pre-petition secured parties, such challenge must be commenced no later than 30 days after entry of this final order. That ran on February 20th. The collateral trust is the only defendant. The only possible explanation for why they didn't add any other defendants is because nobody thought that the lien challenge complaint was worth this pot of gold. Now, my friends, my second point, my friends pointed out how the plan contemplates the award of equity. Well, of course it does. You have this $85 million estate value, and the question was, how do you divide it up? When it comes to the causes of action, what the complaint, what the plan contemplates is that there are certain causes of action that can actually add money on top of the $85 million. The suit against the Sanchez family for excessive compensation was one of them. It added $2 million of actual revenue that raised the estate value from 85 to 87, and they got half of the two under the terms of the plan. The lien challenge complaint actually also had counts that could do that, too. If you look at counts 8 and 9 of the lien challenge complaint, they had nothing to do with 550A, and they had to do with whether certain assets sitting out there were covered by the lien, including cash that was sitting in a bank account. That was, I think, count 8, and the proceeds from a lawsuit that they had against their former employees in count 9. If either of those things actually generated revenue, the cash in the bank accounts or the lawsuit, that would have been added on top of the $85 million, and they would have gotten half of it, just like with the Sanchez suit. But, Your Honor, there is nothing, not a word in this plan that says the bankruptcy court gets to inflate the estate with $200 million of made-up recovery bucks. Mr. Francisco, I want to put my finger on this argument to make sure I understand. Are you saying that, I understand you're saying that the plan doesn't provide for this form of equity allocation. I take some parts of your brief to also say that even if the plan specifically said exactly what your friends on the other side said, it would still be barred by 550. Yes, Your Honor, absolutely. And that's because... Well, can I just put one fine question on it? I want to hear your response. Yeah. Is your position that parties cannot agree in a plan to things that would otherwise be barred by 550, right? I mean, is there some reason why the parties can't say, we agree to an equity distribution in the judgment of the district court, and it's going to be guided by the following six factors? No, they could certainly agree to that if they wanted to. I'm saying two different things. One, I'm saying that they didn't agree to that, and what I was just trying to explain was what they actually agreed to. But two, what I'm saying is that even if they did agree to that in general, they also made quite clear in this plan what that meant. What that meant was that the creditor representative simply had standing to prosecute a theoretical lawsuit on behalf of the debtor itself, but the question subject to all of our defenses, that is explicit in the terms of the plan, preserves all of our defenses. So they need to show that in that hypothetical world, Sanchez actually could have recovered $200 million, and it couldn't, and this is my final point, because, Judge Jones, I want to make clear that you understand what it is, the remedies that we're asking for, what exactly they are. Our principal argument is that they're not entitled to anything for two reasons. First, under 550A, you can only get the property or its value, not both, and they already got the property, so they're not entitled to a value judgment. Even if you disagree with me on that, they're not entitled to get value unless they show a loss. That's Trout and Brumis. On whether or not loss is required, Your Honor, 550A specifically says that they can recover. The dictionary definition of recover is to get back something that you have lost. If you haven't lost value, you can't recover value, because that's a windfall, and Trout and Brumis made clear that in this specific context, a nonpossessory lien that has never been exercised, there's no loss in value, and so there's no recovery of value, you just get the liens back. That's our main argument, they get nothing. Our alternative argument is that the only loss they have even attempted to show on this record were from the bad dip terms. Well, the only even arguably bad dip terms are the $14 million in fees. That would assume that any alternative lender wouldn't have charged any fees at all, which is preposterous, but I'm willing to spot them that for the sake of argument, because that means that they get $14 million, not $200. That is still substantial. That gives them 14% of a billion-dollar company against, remember, a zero-dollar investment. So that would still be a substantial recovery. I actually think it's wrong, but that's the absolute most that they would be entitled to on this record. Unless Your Honors have further questions. I think we don't. Thank you. We'll have to take a brief recess to reconstitute the panel.